[Cite as *Ciotto v. Hinkle*, 2019-Ohio-3809.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
HURON COUNTY

The Estate of Linda Ciotto, et al.　　　　　Court of Appeals No. H-18-011

　　　　Appellants　　　　　　　　　　　Trial Court No. CVC 20160644

v.

Billie A. Hinkle　　　　　　　　　　　**DECISION AND JUDGMENT**

　　　　Appellee　　　　　　　　　　　Decided:　September 20, 2019

* * * * *

Rhonda Baker Debevec and Jonathon Angarola, for appellants.

Mark S. Maddox and Russell V. Leffler, for appellee.

* * * * *

**ZMUDA, J.**

## I.  Introduction

{¶ 1} This matter is before the court on appeal from a judgment of the Huron County Court of Common Pleas, granting summary judgment and dismissing the claims of appellants, The Estate of Linda Ciotto, Deceased, Mary Ciotto and Michael Blair,

individually and as co-administrators of the Estate, and Christopher Blair.[1]  For the reasons that follow, we affirm.

## A. Background

{¶ 2} On July 28, 2015, James Blair took his mother's loaded, unsecured gun from her bedroom, went next door, shot Linda Ciotto to death, and mutilated her body with her lawnmower because he was enraged that she mowed her lawn after dusk.  His mother, appellee Billie Hinkle, had given Blair permission to move in with her about a year and a half earlier, after Blair lost his job.  Blair is currently serving a life sentence for the murder.

{¶ 3} On July 25, 2016, appellants filed their claim against appellee, seeking damages for negligence and wrongful death, and for intentional and negligent infliction of emotional distress.[2]  After the parties engaged in discovery, appellee moved for summary judgment on January 19, 2018, arguing the absence of any legal duty owed as to the negligence and wrongful death claims, and the lack of evidence to support the emotional distress claims.  Finding no genuine issues of fact related to the appellants' claims, the trial court granted summary judgment, disposing of appellants' amended complaint in its entirety.

---

[1] There is nothing in the record to indicate any relation between appellants Michael and Christopher Blair and appellee's son, James Blair.

[2] Appellants filed an amended complaint on October 19, 2016.

2.

## B. Assignments of Error

{¶ 4} This appeal followed, with appellants asserting the following assignments of error:

I. The trial court's granting of summary judgment to Appellee on Appellant's [sic] negligence and wrongful death claims was error since reasonable minds could conclude the Appellee was negligent under the circumstances and that harm to Appellants' decedent was foreseeable.

II. As a matter of law, the trial court erred in granting Appellee summary judgment on Appellants' negligence and wrongful death claims since genuine issues of material fact exist on whether Appellee had a "special relationship" with James Blair, and, thus, a duty to exercise control over him.

III. The trial court improperly granted summary judgment on the Appellants' negligent infliction of emotional distress claim despite evidence from which the reasonable jury could conclude that Appellee failed to report the presence of the decedent's corpse delaying its proper handling by hours and causing serious emotional distress to the decedent's surviving adult children.

IV. Since reasonable minds could differ on whether Appellee's conduct in failing to report the shooting and presence of a corpse; and hiding the murder weapon and lying about [its] location was extreme and outrageous and caused the Appellants' serious emotional distress, genuine

issues of material fact existed regarding Appellants' claims for intentional infliction of emotional distress which prohibited the granting of summary judgment.[3]

## II. Summary Judgment

{¶ 5} Appellants argue genuine issues of fact remain as to each of their claims, challenging the trial court's determinations relative to the duty owed by appellee and the existence of disputed facts to support the emotional distress claims of appellants. Therefore, they contend, the trial court erred in granting summary judgment.

{¶ 6} The parties largely agree on the facts of this case. Appellee's 50 year-old son took appellee's loaded handgun, without her permission, walked next door to the house of appellant's decedent, Ciotto, and shot her as she mowed her lawn, resulting in her death. At the time of the murder, Blair lived with appellee, was unemployed, and rarely ventured out of appellee's house. Blair owned his own firearm, but had accessed appellee's handgun on two occasions a year before the murder, shooting it in the air from appellee's back deck after he had been drinking. Appellee ordered Blair to leave her firearm alone, and Blair complied for about a year, up until the night of the murder.

{¶ 7} The detailed recitation of the facts, provided by appellants, paints a picture that is shocking and horrific. There is no dispute, moreover, that Blair murdered Ciotto, mutilated her body, and then returned home to his bedroom, behaving as if nothing out of

---

[3] Appellants also asserted a negligent infliction of emotional distress claim on behalf of Ciotto's estate, but withdrew this claim prior to the trial court's ruling on summary judgment.

4.

the ordinary had occurred. Despite the fact that Blair's criminal actions directly caused the death, appellants filed suit against appellee, seeking to hold her liable for Blair's conduct. Based on existing legal precedent, the trial court determined, as a matter of law, that appellee was entitled to summary judgment as to all claims against her.

{¶ 8} We review the trial court's ruling on summary judgment de novo, applying the same standard as the trial court. *Bonacorsi v. Wheeling & Lake Erie Ry. Co.,* 95 Ohio St.3d 314, 2002-Ohio-2220, 767 N.E.2d 707, ¶ 24.

{¶ 9} As provided by Civ.R. 56(C), summary judgment is appropriate if the moving party demonstrates: "(1) that there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one conclusion, and that conclusions is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor." *Harless v. Willis Day Warehousing Co.,* 54 Ohio St.2d 64, 66, 375 N.E.2d 46 (1978).

{¶ 10} In reviewing the trial court's judgment, we examine the evidence to determine whether a genuine issue of material fact remains in dispute. "A 'material' fact is one which would affect the outcome of the suit under the applicable substantive law." (Citation omitted.) *Noe v. Keller* 6th Dist. Lucas No. L-12-1199, 2013-Ohio-2251, ¶ 27.

{¶ 11} In this case, the parties largely agree on the material, underlying facts. The dispute, instead, concerns the legal significance of these facts as they relate to the duty owed in negligence, and as to the support for the emotional distress claims. Appellants' assignments of error fall into two categories, challenging the trial court's determinations

5.

relative to the duty owed by appellee and whether the existence of disputed facts support the emotional distress claims of appellants. We will address each of appellants' assignments of error accordingly.

## A. Duty

{¶ 12} Appellants asserted claims against appellee that are based on negligence and wrongful death. An action for wrongful death is a statutory claim, permitting recovery of damages for the decedent's estate, where "the death of a person is caused by wrongful act, neglect, or default which would have entitled the party injured to maintain an action and recover damages if death had not ensued[.]" R.C. 2125.01. In this case, appellants alleged negligence as the wrongful act.

{¶ 13} To prevail on a negligence claim, appellants must demonstrate the existence of a duty, breach of that duty, and a resulting injury. *Mussivand v. David,* 45 Ohio St.3d 314, 318, 555 N.E.2d 265 (1989). "While negligence actions always involve mixed questions of law and fact, the existence of a duty is, in the first instance a question of law for the court." *Clemets v. Heston*, 20 Ohio App.3d 132, 134-135, 485 N.E.2d 287 (6th Dist.1985).

{¶ 14} The allegations of negligence in appellants' amended complaint include a mixture of averments referencing both affirmative conduct under premises liability and a failure to act to control or prevent the criminal conduct of a third party. The allegations include the following:

6.

At all relevant times herein, Defendant Hinkle had a duty to use ordinary care in controlling and maintaining her premises.

Despite knowing about James Blair's mental instability and the danger he posed as described above, Defendant Hinkle unreasonably allowed James Blair to store firearms on her premises.

At all times relevant, Defendant Hinkle had the duty to use ordinary care in securing and storing her firearm under the circumstances.

Upon information and belief, Defendant Hinkle knew, or in the exercise of reasonable diligence should have known, that leaving her firearm unsecured, loaded and within easy access of her adult son, James Blair, presented an unreasonable risk of harm to the public including, but not limited to, Plaintiffs' decedent, given James Blair's mental instability and prior misconduct.

Notwithstanding Defendant Hinkle's knowledge of the danger described above, Defendant Hinkle continued to unreasonably and carelessly store her loaded firearm in a location known to her adult son, James Blair, who resided in her home.

In addition to Defendant Hinkle generally knowing about the unreasonable danger this situation posed to the public, on the evening of July 28, 2015 in particular, defendant Hinkle knew that James Blair was

7.

extremely agitated, unstable and, more particularly, irate with Plaintiffs'

decedent.[4]

* * * Despite Defendant Hinkle knowing about James Blair's

extreme anger toward Plaintiffs' decedent, his unstable mental condition

generally and the danger he posed to Plaintiffs' decedent, defendant Hinkle

unreasonably and carelessly failed to take any measures to hide, unload or

otherwise secure her firearm that was openly stored in her bedroom.

As a direct and proximate result of the Defendant Hinkle's

negligence described above, James Blair had unfettered access to, and use

of, Defendant Hinkle's loaded firearm which he used to fatally shoot

Plaintiffs' decedent in the head on the evening of July 28, 2015.

As a proximate result of the Defendant's negligent conduct

described above, Plaintiffs' decedent suffered conscious pain and suffering,

and ultimately her premature death.

{¶ 15} Based on the pleading, appellants argue theories of duty that lack support

under existing Ohio law, whether the alleged duty arises from affirmative conduct under

premises liability law or from appellee's failure to act to control or prevent Blair's

criminal conduct. In support of the claimed legal duty, the only Ohio authority cited by

---

[4] The amended complaint also contains allegations of a verbal altercation between Blair
and Ciotto in the hours preceding the murder. The record, however, contains no evidence
demonstrating Blair engaged in any type of altercation with Ciotto prior to the criminal
attack, and appellants do not argue such an altercation occurred with Ciotto, or with any
other neighbor during the period Blair resided with appellee.

8.

appellants pertains to liability arising from negligent entrustment of a firearm. *See Byers v. Hubbard,* 107 Ohio App.3d 677, 681, 669 N.E.2d 320 (8th Dist.1995). Appellants, however, do not claim that appellee negligently entrusted her handgun to Blair, but instead argue appellee should have foreseen the injury to Ciotto, arising from her practice of storing a loaded handgun near her bed.

{¶ 16} A duty arises by law, and requires more than just foreseeability. *Simpson v. Big Bear Stores Co.,* 73 Ohio St.3d 130, 134, 652 N.E.2d 702 (1995). In negligence claims, whether a defendant owes a duty depends on whether a plaintiff's interests "are entitled to legal protection against the defendant's conduct." If foreseeability alone created a duty, then such liability could, potentially, arise without limit. *Simpson* at 134. Duty and foreseeability, therefore, are separate things, with foreseeability defining "the scope and extent of the duty." *Plank v. DePaul Cranes,* 2d Dist. Montgomery No. 10486, 1988 WL 110312 (Oct. 21, 1988).

{¶ 17} There is no simple definition of "duty," as the notion of "duty" is amorphous. *Clemets v. Heston,* 20 Ohio App.3d 132, 135, 485 N.E.2d 287 (6th Dist.1985), fn 2. In other words, while the determination of duty is a matter of law, there is "no formula for ascertaining whether a duty exists." *Wallace v. Ohio DOC*, 96 Ohio St.3d 266, 2002-Ohio-4210, 773 N.E.2d 1018, ¶ 24, quoting Prosser, Law of Torts, 325-326 (4th Ed. 1971). Duty "may be established by common law, by legislative enactment, or by the particular circumstances of a given case." *Wallace* at ¶ 23.

{¶ 18} Here, appellants do not clearly articulate the basis of the claimed duty beyond argument of foreseeability and policy, and cite to no Ohio authority in support,

9.

relying instead on authority from other jurisdictions to support a legal duty. Despite the allegations in their pleading of either premises liability or a duty to control a third party, appellants now argue a broader negligence claim, arguing duty arising from the facts, and encouraging adoption of law from other states as if this case presented an issue of first impression in Ohio.

{¶ 19} We shall address each basis for duty in turn, considering appellants' claims and all applicable law.

### 1. Common Law Duty

{¶ 20} The common law arises from judicial precedent, rather than statute or constitution. *Black's Law Dictionary* 313 (9th Ed.2009). Accordingly, we look first to Ohio precedent in determining the existence of a duty, but lacking contrary, controlling precedent, may recognize a new duty as adopted by other jurisdictions, as appellants request. "The common law is ever-evolving and we have the duty, absent action by the General Assembly on a specific question, to be certain that the law keeps up with the ever-changing needs of a modern society." *Gallimore v. Children's Hosp. Med. Ctr.*, 67 Ohio St.3d 244, 251, 617 N.E.2d 1052 (1993).

### a. Premises Liability

{¶ 21} First, appellants argue that the trial court erred in finding appellee owed no duty to Ciotto, because harm was foreseeable due to appellee's practice of keeping a loaded weapon unsecured and accessible to Blair, an allegedly mentally unstable alcoholic. This theory of duty arises from allegations that appellee failed to secure her weapon around Blair, exposing Ciotto to danger. In other words, appellants first argue

10.

negligence based on premises liability, contending appellee owed Ciotto a duty to protect her from the unsecured firearm.

{¶ 22} In support of this type of duty, appellants reference no Ohio law, presenting the issue as one of first impression. However, Ohio courts have addressed this issue, and determined that a failure to secure a dangerous instrumentality could support a premises liability claim, but only where the law imposed a special relationship between the owner of the premises and the third party who accessed and used that dangerous instrumentality to inflict injury. In *Hall v. Watson,* 7th Dist. Mahoning No. 01 CA 55, 2002-Ohio-3176, the Seventh District Court of Appeals found a duty existed where a gun owner failed to secure his loaded firearm, and left it accessible to young guests in the home. The youths snuck the firearm out of the home, and a week later, negligently shot and killed their cousin. *Hall* at ¶ 17. Based on the adult-child relationship, a duty arose to secure the firearm, based on premises liability law. *Id.*, citing *Bridges v. Dahl,* 108 F.2d 228 (6th Cir.1939).

{¶ 23} The same law was applied by the Eleventh District Court of Appeals in *Reddick v. Said,* 11th Dist. Lake No. 2011-L-067, 2012-Ohio-1885. Virginia and Nicholas Gates, a mother and son, kept an unsecured firearm on their property, and granted Leroy Strickland free access to the property to do odd jobs. On the day of the shooting, Virginia asked Strickland to take care of the premises while she was away on business. *Id.* at ¶ 11. Nicholas, who owned the firearm, was in jail the date of the shooting. *Id.* at ¶ 20.

11.

{¶ 24} At the time, Nicholas' girlfriend, Stephanie Said, was also living at the home. *Id.* On the date of the shooting, Said's friend, Megan Price, came to the home to "hang out," and called James Reddick to pick her up. *Id.* at ¶ 10. Strickland arrived at the house, saw Reddick, an African-American man, talking to Said and Price in the yard, went into the garage where he had placed Nicholas's firearm, and returned and shot Reddick four times. *Id.* at ¶ 12. Said and Strickland were friendly and had attended Alcoholics Anonymous meetings together, and Said acknowledged that Strickland was a convicted sex offender and a racist. *Id.* at ¶ 13. Nicholas, also, was aware of Strickland's criminal history and substance abuse issues, and believed Strickland had "anger issues." *Id.* at ¶ 20.

{¶ 25} Unlike the finding in *Hall,* the court found no special relationship between Virginia and Nicholas Gates and either Reddick or Strickland. *Id.* at ¶ 44. The court also determined that Said owed no duty based on a special relationship, because, despite her knowledge that Strickland was a racist, "[t]here was no evidence that Said knew Strickland was coming to the property to shoot Reddick or to harm Reddick in any way." *Id.* at ¶ 46.

{¶ 26} Ohio courts have also considered claims of negligent storage of a firearm without directly referencing premises liability law, reaching the same conclusion regarding the need for a special relationship. For example, in *Blevins v. Hartman,* 5th Dist. Richland Nos. 12CA115 and 12CA116, 2013-Ohio-3297, the Fifth District Court of Appeals found that, lacking any special relationship, parents owed no duty to a shooting victim arising from a failure to secure their firearms. In that case, their adult son, who

12.

suffered from mental illness, took an unsecured gun from their home and shot his ex-girlfriend. *Id.* at ¶ 47. The court noted that the son had no violent criminal history, and refused to equate mental illness with violent behavior. *Id.*

{¶ 27} While we have not previously addressed the issue of liability arising from an unsecured firearm, we have considered criminal conduct and premises liability, applying a totality of the circumstances standard. *Krause v. Spartan Stores, Inc.,* 158 Ohio App.3d 304, 2004-Ohio-4365, 815 N.E.2d 696, ¶ 7 (6th Dist.). In a premises liability case, "there is no common-law duty to anticipate or foresee criminal activity." *Federal Steel & Wire Corp. v. Ruhlin Const. Co.,* 45 Ohio St.3d 171, 174, 543 N.E.2d 769 (1989), citing Prosser & Keeton, Law of Torts, 201-203, Section 33 (5 Ed.1979). A special relationship may arise based on the foreseeability of the harm, however, to impose a duty where a third party uses the property to inflict harm "similar in nature to that already experienced or initiated" from the premises. *Id.* at 178.

{¶ 28} In making this determination, "[b]ecause criminal acts are largely unpredictable, the totality of the circumstances must be 'somewhat overwhelming' in order to create a duty." *Krause* at ¶ 7, citing *Reitz v. May Co. Dept. Stores,* 66 Ohio App.3d 188, 193-194, 583 N.E.2d 1071 (8th Dist.1990). While there is no exact definition for "somewhat overwhelming," the standard requires circumstances in which "a reasonably prudent person would have anticipated that an injury was *likely* to result from the performance or nonperformance of an act." (Emphasis added.) *Fed. Steel* at 174.

{¶ 29} In applying this standard, we previously found that an assault behind a bar was not foreseeable, "[d]espite bad stares and one or two insulting comments" between

13.

the assailant and the victim, and claims of the bar's "reputation for violence." *Stoner v. Montpelier Tavern Co.,* 98 N.E.3d 1092, 2017-Ohio-7995, ¶ 43 (6th Dist.). Even where "an occasional fight may have occurred" on the premises, lacking "a reputation for regular outbreaks of violent behavior," a "sudden" and "out of the blue" fight was not deemed foreseeable. *Shadler v. Double D. Ventures, Inc.,* 6th Dist. Lucas No. L-03-1278, 2004-Ohio-4802, ¶ 31. "The test for foreseeability is one of likelihood, not mere possibility." *Id.*

{¶ 30} Lacking knowledge that an injury is likely, there is no duty to prevent the criminal act of a third party under premises liability law. *See e.g. Philon v. Knerr,* 6th Dist. Erie No. E-11-011, 2012-Ohio-2342, ¶ 6-8 (where two customers engaged in verbal altercation inside the store, and after exiting the building, one of the customers purposely ran the other down with his car, no duty to prevent the assault as attack not foreseeable); *but see Warner v. Uptown-Downtown Bar,* 6th Dist. Wood No. WD-97-051, 1998 WL 123087 (Mar. 13, 1998) (bar patron's assault was foreseeable based on the frequency of fights on the premises).

{¶ 31} In support of their allegations that appellee failed to secure her firearm, appellants do not claim Blair previously used appellee's handgun to inflict harm "similar in nature," and the evidence fails to demonstrate facts that "somewhat overwhelmingly" demonstrate that appellee could have anticipated Blair would use appellee's firearm to murder her neighbor. In her deposition, appellee indicated that Blair had no violent criminal history, had never engaged in physical fights or confrontations with others, and

14.

never displayed anger toward her or made her fearful of him. By the time of the murder, furthermore, Blair had become a recluse, and had not left the home in many months.

{¶ 32} While appellee acknowledged Blair seemed depressed, threatened suicide, and heard voices on at least one occasion, she did not believe Blair needed immediate treatment, and she did not believe he was mentally unstable, prior to the murder. She also indicated that, on the two occasions Blair shot her handgun from the back deck, he had been drinking but was not intoxicated, and he was not upset. All appellee knew, the night of the murder, was that Blair's reclusiveness and drinking had worsened by that time, he was intoxicated, and he was upset with Ciotto, calling her a "she-bitch" out of her hearing, and flipping her off, out of her view, before disappearing to his bedroom for about an hour.

{¶ 33} In arguing foreseeability, appellants rely heavily on appellee's admissions she should have secured her firearm, based on hindsight, as well as embellishments to appellee's deposition testimony. For example, appellants argue that appellee knew Blair "*should seek* mental help with a psychologist or psychiatrist," despite her testimony that she urged him to see a doctor, but did not consider him unstable. Appellants also argue Blair suffered from "hallucinations involving appellee's neighbors including the decedent allegedly threatening Blair," but the evidence indicates appellee understood Blair harbored false beliefs, or delusions, and believed the neighbors were watching him, with no indication Blair had any actual hallucinations or any physical interactions with the neighbors, or that Blair ever exhibited violent tendencies. Finally, appellants argue that Blair previously shot the firearm from appellee's back deck, "endangering appellee's

15.

neighbors," with no evidence of danger beyond an inference that firing a gun off the back deck is the equivalent of firing a gun at other people. Based on the limited testimony regarding the surroundings, Ciotto's back yard was quite large and a row of trees created a barrier between appellee's and Ciotto's property. There is also no evidence indicating any neighbor was even aware of, or reported the prior shooting from the back deck, neutralizing any inference of danger based solely on the proximity between the residences and the fact Blair fired a gun.[5]

{¶ 34} Applying Ohio premises liability law to the facts of this case, the totality of the circumstances created no duty owed to Ciotto, arising from appellee's failure to secure her handgun. Based on the evidence, appellee could not have foreseen that Blair, an entrenched recluse who had no prior violent history and spent a quiet hour before the shooting, would decide to disobey his mother after a year of compliance and take her handgun, leave the house, and commit a heinous murder as his first physical interaction with Ciotto. Such criminal conduct, moreover, represented an extreme departure from his prior conduct, notwithstanding his use of the handgun about a year prior. Additionally, while Blair's later diagnosis indicated a potential for homicidal violence,

---

[5] Admittedly, a loaded firearm is a dangerous instrumentality, and *use* of a loaded firearm "requires extreme caution at all times to avoid the discharge of the gun and injury to another." *Huber v. Collins,* 50 N.E.2d 906, 908 (2d Dist.1942). Furthermore, in criminal proceedings, the fact an offender used a firearm to commit a murder may be dispositive of the offender's intent. *State v. Seiber,* 56 Ohio St.3d 4, 14, 564 N.E.2d 408 (1990), quoting *State v. Widner,* 69 Ohio St.2d 267, 270, 431 N.E.2d 1025 (1982); *see also State v. Dunlap,* 73 Ohio St.3d 308, 316, 652 N.E.2d 988 (1995). There is no Ohio authority, however, that imposes strict liability for unsafe or unsecured *storage*, based on the inherent danger of a loaded firearm.

16.

this subsequent diagnosis did not constitute prior knowledge on the part of appellee. At most, appellee acknowledged Blair's depression and anger with her neighbor, although she never witnessed any interactions between Blair and any neighbor, and she knew Blair to be a recluse in her home, and her only fear was that he might harm himself. In arguing a legal duty, appellants failed to demonstrate sufficient facts to support "somewhat overwhelming" circumstances, sufficient to indicate the murder was likely, and therefore foreseeable, as required under Ohio premises liability law.

{¶ 35} Despite the existence of Ohio authority regarding liability for unsecured firearms, or premises liability more generally, appellants rely on precedent of other states in seeking to demonstrate an affirmative common law duty under Ohio law. Notably, appellants avoid mention of Ohio authority, and rather than acknowledge and distinguish this precedent, proceed directly to the law of other states as persuasive and appropriate. Appellants' authority, however, does not support their argument, as each case cited includes facts demonstrating prior violence or a legal disability to possess a firearm, neither of which is present in the facts of this case. Most importantly, if these facts were present, they would more likely support appellants' claims under Ohio law.

{¶ 36} Appellants first argue that we should adopt the rule in *Jupin v. Kask,* 849 N.E.2d 829 (Mass.2006), in which the Supreme Court of Massachusetts determined a duty existed, despite the general rule that a landowner has no duty to protect another from a third party's intentional criminal act, as "one of a number of limited exceptions to that

17.

general rule, where both the doctrine of foreseeability and sound public policy counsel an alternative conclusion." *Jupin* at 156. In *Jupin,* parents permitted their adult son to have a key to their home, knowing of the son's history of criminal violence and mental health issues. The son used his key to enter the home, break into a poorly secured gun safe, and steal a weapon later used to shoot a police officer as he attempted to arrest the son on an outstanding warrant. While rejecting strict liability for failing to properly secure firearms within a home, the court found the harm caused by permitting unsupervised access to someone with a history of criminal violence and mental instability was foreseeable harm, considering "emerging social customs and values, as well as appropriate social policy[.]" *Id.* at 156.

{¶ 37} Similarly, in *Estate of Heck v. Stoffer,* 786 N.E.2d 265 (Ind.2003), the Supreme Court of Indiana determined a duty existed based upon nearly identical facts. In that case, the homeowners' adult son had a violent criminal history and was a fugitive at the time he entered the home with his own key, took a handgun, and later shot and killed a police officer to avoid arrest. As in *Jupin,* the Court determined the harm was foreseeable, based on awareness that the son was "a mentally disturbed, habitual and violent offender [with] free access to the premises." *Heck* at 268-269. The parents in *Heck,* furthermore, were aware that their son was a fugitive from the law, and they assisted him in avoiding arrest by permitting him to hide out at their lake cottage. *Id.* at 267.

18.

**{¶ 38}** Unlike the facts in *Jupin* and *Heck,* Blair had no violent, criminal history, he was not a fugitive, and his mental illness was undiagnosed prior to the murder.[6] Furthermore, while the Indiana Supreme Court imposed a policy-based duty on a gun owner, the Indiana legislature enacted a law to negate the court's ruling, providing statutory immunity for gun owners for "an act or omission related to the use of a firearm" by another person, if the firearm was wrongfully procured without the owners' consent. *See Nicholson v. Lee,* Ind. Ct. App. No. 18A-CT-1949, 2019 WL 613227 (Feb. 14, 2019), citing I.C. § 34-30-20-1.

**{¶ 39}** Appellants also rely on the Rhode Island case of *Volpe v. Gallagher*, 821 A.2d 699 (R.I.2003), arguing the facts and circumstances mostly align with those in the present case. In *Volpe,* however, the facts did not concern an allegation of a gun owner's failure to secure their own firearm. Instead, the issue was one of premises liability, based on the homeowner permitting her mentally ill, adult son to amass a cache of weapons in her home.

**{¶ 40}** The adult son in *Volpe* had lived with his mother all 34 years of his life, a "jobless and practically friendless loner who was plagued by hallucinations, imaginary

---

[6] Blair's mental health was at issue, initially, in his criminal proceeding. Blair first entered an NGRI plea and his competency to stand trial was raised. After referral for mental health evaluations, Blair was diagnosed as suffering from a mood disorder with psychosis, with a history of depression, anger issues, and "suicidal and homicidal ideations," but was otherwise prevented from pursuing his NGRI plea and deemed competent to stand trial. Appellants obtained the records from the criminal proceedings through subpoena, and submitted the records as evidence in opposing summary judgment. The deposition of appellee, however, demonstrated appellee had no knowledge of Blair's mental health history and diagnosis prior to the murder.

19.

conversants, and a paranoid distrust of others[.]" *Volpe* at 702. The son "had suffered for many years from an increasingly severe and delusional mental illness[,]" and was permitted, by his mother, to keep a gun collection in his basement quarters. *Id.*

{¶ 41} On July 3, 1994, the son emerged from the basement with a loaded shotgun and shot his next-door neighbor as he trimmed the hedgerow between the two houses. *Volpe* at 703. After a jury found the mother liable in negligence, she appealed, arguing no duty to "disarm her son or otherwise control his arms-bearing activity on her property." *Id.* at 704. The evidence did not indicate whether the son was on his mother's property or the neighbor's when he fired the weapon. *Id.* at 703.

{¶ 42} In determining a duty existed, the Supreme Court of Rhode Island considered the relationship of the parties, the mother's obligation, "public policy considerations, and notions of fairness." *Volpe* at 705. Relying on Section 318 of Restatement of the Law, 2d, Torts, the Court in *Volpe* determined the issue as one of premises liability, and found that the mother knew, or had reason to know, of her son's dangerous gun hobby on her property, as well as her son's severe mental illness, a condition that had worsened despite institutionalization and two years of outpatient treatment. *Id.* at 708-709.

{¶ 43} While the facts in *Volpe* and the present case both involve an adult son killing a neighbor over an imagined yardwork dispute, there are significant facts in this case which differ from those in *Volpe,* diminishing its value as persuasive authority. First, the son in *Volpe* had a documented history of severe mental illness, including institutionalization. Under Ohio law, the son in *Volpe* would not have been eligible to

20.

legally possess weapons, as R.C. 2923.13(A)(5) prohibits weapon possession by a person who has been committed to a mental institution, unless relived from that disability by law. In addition to appellee's handgun, Blair owned his own firearm, with no evidence he illegally obtained or possessed that firearm.

{¶ 44} Also unlike the son in *Volpe,* doctors diagnosed Blair's mental illness as part of the mental health evaluations ordered by the trial court in his criminal case, after the murder, and Blair had no history of institutionalization. Appellee, herself, offered no testimony to support any knowledge of severe mental illness, prior to the murder, but instead indicated only that Blair was odd, reclusive, and paranoid, and appellee feared he might harm himself.

{¶ 45} Finally, the son in *Volpe* could not live independently, and was under his mother's care and supervision. Blair, in contrast, demonstrated an ability to live on his own for 30 years, and even lived with his father for a time to provide for his father's care. At the time of the murder, Blair stayed with his mother, not because he needed her supervision, but because he lost his job and did not seek new employment, and she was willing to provide him with financial support and a place to live.

{¶ 46} While appellants' foreign case law is distinguishable based on evidence of prior violence or a known mental disability not demonstrated in this case, other states, citing facts more similar to the present case, have declined to find a duty owed for negligent storage of firearms without a special relationship, consistent with Ohio law. In *Bridges v. Parrish,* 742 S.E.2d 794 (N.Car.2013), considering nearly identical facts, the Supreme Court of North Carolina found no duty to secure a firearm to prevent their 52-21.

year-old son from taking it and shooting his ex-girlfriend. In *Brisco v. Fuller,* 623 So.2d 196, 199 (La.App.1993), a Louisiana appellate court found no duty owed by parents to conceal or hide guns from an adult child, alleged to be dangerous, where there was no indication of any mental illness or emotional derangement, and the parents were not alleged to be custodians. In *Thomas v. Bokelman,* 462 P.2d 1020, 1022 (Nev.1970), the Nevada Supreme Court declined to find a duty where homeowners kept firearms in proximity of a 35-year old man "who had 13 years before been convicted for an act of rape." The court found the homeowners could not have foreseen the shooting, as "[t]he risk, if any, was that [the man] might again rape someone."

{¶ 47} In arguing that appellee is liable for failing to secure her firearm, appellants ignore Ohio premises liability law, and seek to impose a duty to secure weapons based on the law of other jurisdictions that includes facts more strongly indicating the foreseeability of gun violence. However, we must first look to Ohio law, and controlling Ohio precedent requires either a special relationship, or previous conduct, "similar in nature," that demonstrated "somewhat overwhelmingly" that appellee could have anticipated Blair would likely use the firearm to commit a violent crime. Lacking these types of facts, appellants' claim arising from premises liability lacks support. Therefore, no duty arose as a matter of law, based on application of Ohio premises liability law.

### b. Duty to Act/ Duty to Control

{¶ 48} Appellants also allege that appellee failed to act to protect Ciotto, and had a duty to control Blair's conduct. This allegation arises from a failure to act, or nonfeasance, as opposed to any affirmative wrongful conduct, constituting either

22.

misfeasance or malfeasance. "Nonfeasance is the omission of an act which a person ought to do; misfeasance is the improper doing of an act which a person might lawfully do; and malfeasance is the doing of an act which a person ought not to do at all." (Citation omitted.) *State ex rel. Neal v. State Civ. Serv. Commission*, 147 Ohio St. 430, 434, 72 N.E.2d 69 (1947).[7]

{¶ 49} Appellants argue that, because it was possible and perhaps even foreseeable that Blair would take her loaded gun and use it, appellee owed a duty to Ciotto and the public at large to prevent Blair's access to her gun. To find such a duty, however, this court must also find, for the first time in Ohio jurisprudence, that a duty exists to control the actions of a third person without any special relationship, to prevent that person from harming others, contradicting existing, controlling precedent. *Simpson,* 73 Ohio St.3d at 134, quoting Restatement of the Law 2d, Torts, Section 315 (1965).[8] Appellants ask this court to extend the law, "to provide a remedy where none exists." *Id.* at 134.

---

[7] Appellants' premises liability claim would arguably fall under the category of misfeasance, as appellee legally owned her weapon and violated no statute in keeping it in her bedside table for her protection.

[8] Restatement of the Law 2d, Torts, Section 315 provides:

> There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless
>
> (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
>
> (b) a special relation exists between the actor and the other which gives to the other a right to protection.

{¶ 50} Even if "the actor realizes or should realize that action on his part is necessary for another's aid or protection" that realization will not, standing alone, impose such a duty. *Id.* at 134, quoting Restatement of the Law 2d, Torts, Section 314; *see also Hill v. Sonitrol of Southwestern Ohio, Inc.*, 36 Ohio St.3d 36, 521 N.E.2d 780 (1988). Simply put, a duty must exist prior to imposing any legal liability for nonfeasance. *Clemets,* 20 Ohio App.3d at 135; *see also* Restatement of the Law 2d, Torts, Section 302(b), Comment a (1965). The kind of duty contemplated, moreover, is "one obligating the defendant to act toward the plaintiff in some affirmative manner in a situation where a 'definite relation' exists between them." *Clemets* at 135, citing Prosser & Keaton, Torts, Section 37, 236 (5 Ed. 1984); *see also Noe*, 6th Dist. Lucas No. L-12-1199, 2013-Ohio-2251 at ¶ 42.

{¶ 51} In arguing that the foreseeability of Blair's conduct created the duty, appellants rely on Restatement of the Law 2d, Torts, Section 302(b), which provides:

> A negligent act or omission may be one which involves an unreasonable risk of harm to another through * * * the foreseeable action of the other, a third person, an animal, or a force of nature.

Ohio courts applying Section 302(b), note that "[t]his Section is concerned only with the negligent character of the actor's conduct, and not with his duty to avoid the unreasonable risk." *Schneider v. Kumpf,* 2016-Ohio-5161, 58 N.E.3d 1220, ¶ 94 (2d Dist.), quoting Section 302, Comment a. In other words, this Section addresses

24.

foreseeability, and not duty. Furthermore, "there is no common-law duty to anticipate or foresee criminal activity" as appellants contend. *Fed. Steel*, 45 Ohio St.3d 171 at 174, 543 N.E.2d 769. Appellants fail to cite any Ohio authority applying Section 302(b) to demonstrate duty based only on foreseeability, construing facts similar to this case.

{¶ 52} Instead, Ohio authority provides for no common law duty to secure a firearm, to prevent access and use by an emancipated adult. The only Ohio authority appellants cite, to the contrary, relates to a common law duty arising from an affirmative act, to wit, the negligent entrustment of a firearm. *See e.g. Byers*, 107 Ohio App.3d at 683, 669 N.E.2d 320 (8th Dist.1995) (the act of negligently entrusting a weapon to a third party, knowing of the danger of harm to others, created a "special duty" to protect against the conduct that third party). There is no allegation, in this case, that appellee entrusted her handgun to Blair.

{¶ 53} Appellants' argument, accordingly, appears to center on the appellee's failure to secure her handgun from Blair, an adult who committed an affirmative, criminal act, with no legal basis offered in support. As previously stated, however, a common law duty predicated on nonfeasance, or failure to act, requires a special relationship. *Clemets*, 20 Ohio App.3d at 135. Therefore, common law precedent does not support the existence of a legal duty owed, based on these facts.

### 2. Statutory duty

{¶ 54} There is also no duty established by statute. The Ohio General Assembly has not legislated any standard for storing or securing firearms in the home, to prevent

other adults from accessing those firearms.[9]   There are prohibitions against furnishing a firearm to a juvenile, R.C. 2923.21, but even where a child is concerned, courts have required an actual, affirmative act to constitute "furnishing" a firearm.  *See e.g. State v. Skaggs*, 97 Ohio App.3d 15, 19, 646 N.E.2d 190 (11th Dist.1994) (implicit in the definition of "supplying" a firearm "is the requirement of some type of positive act by which a firearm is supplied, provided, or equipped.").  The law also prohibits improperly storing a firearm in a vehicle.  R.C. 2923.16.  However, gun ownership, alone, does not create a heightened duty to others relative to securing or safeguarding that gun in the home.  The only duty to secure weapons, established by statute, is the duty to secure dangerous ordnance. *See* R.C. 2923.19 ("No person * * * shall negligently fail to take proper precautions [t]o secure the dangerous ordnance * * * against is acquisition of use by any unauthorized or incompetent person.").

{¶ 55} The firearm at issue in this case, however, is not a "dangerous ordnance" as defined by Ohio statute. *See e.g. Reddick*, 11th Dist. Lake No. 2011-L-067, 2012-Ohio-1885, ¶ 59-60; *see also* R.C. 2923.11(L)(2) ("Dangerous ordnance" does not include "Any pistol, rifle, or shotgun, designed or suitable for sporting purposes * * * unless the

---

[9] Other states have enacted safe storage laws to prevent child access to firearms.  For example, a Florida statute requires a premises owner to store a loaded firearm "in a securely locked box or container or in a location which a reasonable person would believe to be secure" or use a trigger lock to prevent child access.  Fla. Stat. 790.174(1).  Likewise, Maryland law prohibits unsecured, loaded firearms "where the person knew or should have known that an unsupervised child would gain access to the firearm."  Md. Code. Ann. Crim. Law 4-104(c).  Violation of the Maryland statute, however, "may not be considered evidence of negligence" in a civil suit.  Md. Code. Ann. Crim. Law 4-104(e)(1).

26.

firearm is an automatic or sawed-off firearm"). Therefore, appellee's practice of keeping a loaded handgun in an unlocked, bedside table drawer violated no duty imposed by statute.

### 3. Circumstantial Duty

{¶ 56} Appellants also advocate for the creation of a duty, tailored for these specific circumstances, arguing what may only be construed as policy considerations. As previously noted, a duty may arise based on considerations "which lead the law to say that a particular plaintiff is entitled to protection." *Toledo Edison Co. v. Ohio Bell Tel. Co.,* 6th Dist. Wood No. WD-14-063, 2015-Ohio-2448, ¶ 9, citing *Wallace,* 96 Ohio St.3d 266, 2002-Ohio-4210, 773 N.E.2d 1018 at ¶ 23. In support of their policy argument, appellants look to the law of other jurisdictions, finding a duty not otherwise recognized by Ohio common law, based on specific circumstances related to firearms and/or mental illness. Appellants' authority, however, is not controlling precedent, is distinguishable from the facts in the present case, and is not persuasive.

{¶ 57} In *Jupin* and *Heck,* a duty to protect from a third party's criminal conduct arose based on foreseeability and public policy, despite the common law rule to the contrary. *Jupin,* 849 N.E.2d at 841; *Heck,* 786 N.E.2d at 268-269. The court in *Volpe* relied, in part, on public policy and "notions of fairness" in determining a duty existed to protect the public. As previously noted, appellants argue Blair's conduct created a duty, based on the Restatement of the Law 2d, Torts, Section 302(b) (1965), because "unreasonable risk of harm" could impose a duty where the harm is foreseeable. Other

27.

jurisdictions, however, have weighed similar policy considerations and Section 302(b), and reached a different conclusion consistent with current Ohio law.

{¶ 58} For example, in *Knight v. Merhige,* 133 So.3d 1140 (Fla.App.2014), the Fourth District Court of Appeals of Florida construed Section 302(b) with public policy considerations in determining parents owed no legal duty to protect against the conduct of a mentally ill adult child, absent a legally recognized "special relationship." In *Knight,* the Merhiges' 35-year-old son, Paul, had exhibited signs of violent, aggressive behavior and social dysfunction from the age of twenty. Between 1994 and 2006, Paul lived with his parents, relied on them financially, and was deemed "legally disabled" due to his continual "violent and aggressive behavior." *Knight* at 1142. Much of Paul's aggression focused on his family members, and one of his sisters obtained a restraining order against him. *Id.* Despite Paul's violent tendencies and a prior suicide attempt, the Merhiges did not prevent Paul from purchasing firearms with money they gave him. *Id.*

{¶ 59} In 2009, the Merhiges rented a condominium for Paul and excluded him from their home. *Id.* at 1142. Paul became increasingly reclusive, and ceased his mental health treatment. *Id.* Despite Paul's deterioration and history of violence directed toward his family, the Merhiges invited Paul to attend the family Thanksgiving dinner with them. *Id.* at 1142-1143. Many family members expressed surprise at Paul's attendance, as they had excluded Paul from previous family functions out of fear of his aggressive tendencies toward them. *Id.* at 1143. The extended family permitted Paul to join them, however, and the dinner proceeded without incident. *Id.*

28.

{¶ 60} Immediately after dinner, Paul slipped out to get something from his car. *Knight* at 1143. He returned with a firearm and opened fire on his relatives, killing both of his sisters, his aunt, and his cousin's six-year-old daughter, and wounding his brother-in-law. *Id.* at 1143. Paul was criminally charged, entered a plea, and received a life sentence. *Id.* The estates of the decedents filed suit against the Merhiges, seeking to hold them liable in negligence based on their creation of a "foreseeable zone of risk," and based on their assumption of a duty to serve as Paul's custodian, creating a special relationship. *Id.*

{¶ 61} The court found dismissal of the negligence claims proper, as the Merhiges owed no legal duty based on the foreseeable risk theory of liability. *Id.* at 1143-1144. This finding is consistent with Ohio law, which construes Section 302(b) as "concerned only with the negligent character of the actor's conduct, and not with his duty to avoid unreasonable risk." *Schneider,* 2016-Ohio-5161, 58 N.E.3d 1220 at ¶ 94, quoting Section 302, Comment a. In refusing to adopt foreseeable risk as "the sole trigger of a legal duty[,]" the court in *Mehrige* noted that a duty for nonfeasance only arises where there is a special relationship or the person who failed to act also exerted control over the premises, the instrumentality, or the person causing the injury. *Knight* at 1143-1144, 1147. While the facts in *Mehrige* are distinguishable, both cases invoke the danger of enabling access to firearms by a mentally unstable individual. The *Mehrige* court's reasoning, despite the factual differences, is nonetheless persuasive. As noted by that court:

Here, a public policy reason militates for a finding of no legal duty even assuming that a [Section 302(b)] foreseeability analysis leads to the conclusion that the shootings were a foreseeable result of the Merhiges' conduct. * * * Here, the essence of the negligence claim is that the Merhiges invited their deeply troubled child to a family gathering, knowing of his difficulties with family members. Family members with psychological or behavioral problems are a common occurrence in Florida and elsewhere. Families should be encouraged to include a troubled family member in the family circle. A holding that the Merhiges owed a legal duty to the members of their family and extended family in this case would discourage families from providing a haven to troubled relatives for fear of civil liability. The result would be to foist those most in need of family interaction on the governmental and charitable social service networks, thereby thrusting a family problem into the hands of society at large, where unhappy outcomes are all too common. Difficult and tragic cases such as this one should not set the standard for the entire universe of family interaction. * * * ." *Knight* at 1150-1151.

{¶ 62} Under Ohio law, policy considerations play a part in determining whether a legal duty exists. As noted by the Ohio Supreme Court, "[a]ny number of considerations may justify the imposition of duty in particular circumstances, including the guidance of history, our continually refined concepts of morals and justice, the convenience of the rule, and social judgment as to where the loss should fall." (Citation omitted.) *Mussivand,* 30.

45 Ohio St.3d 314 at 318, 544 N.E.2d 265.  Before abandoning existing precedent, however, we must weigh policy considerations, not based on a single incident, but based on broader concerns.

{¶ 63} Here, appellee opened her home to her adult son after he lost his job. While he lived with appellee, Blair exhibited signs of depression and anti-social behaviors, and consumed alcohol to excess.  There is no evidence, however, that Blair had a violent criminal history, demonstrated an immediate need for mental health treatment for his issues, or accessed appellee's handgun during the one-year period leading up to the murder.  Furthermore, prior to learning of the murder, appellee's concern, once she learned her handgun was missing, was that Blair would harm himself, rather than others.

{¶ 64} In weighing policy considerations regarding firearm ownership, we note that the right to bear arms is a fundamental right, pursuant to the United States and Ohio constitutions.  *Arnold v. Cleveland,* 67 Ohio St.3d 35, 616 N.E.2d 163 (1993), at paragraph two of the syllabus; *State v. Smith,* 10th Dist. Franklin No. 18AP-124, 2018-Ohio-4297, ¶ 9-10.  The right to bear arms, however, is subject to limitations, but it is "the province of the legislature to regulate" in this area.  *Runions v. Burchett,* 2d Dist. Clark No. 2017-CA-62, 2018-Ohio-2754, ¶ 33, citing *Klein v. Leis,* 99 Ohio St.3d 537, 2003-Ohio-4779, 795 N.E.2d 633, ¶ 8; *State v. Hogan,* 63 Ohio St. 202, 58 N.E. 572 (1900).

{¶ 65} As previously noted, the General Assembly has not regulated the storage of firearms in the home, relative to access by other adults.  Ohio courts, furthermore, have

31.

rejected a per se duty, arising under common law, based on the failure to secure firearms, even where a special relationship exists. *See e.g. Nearor v. Davis,* 118 Ohio App.3d 806, 813, 694 N.E.2d 120 (1st Dist.1997), citing *Bilicic v. Brake,* 64 Ohio App.3d 304, 309, 581 N.E.2d 586 (11th Dist.1989) ("We are unwilling to adopt the doctrine that the owner of a gun 'should be held absolutely liable for any injury that occurs when he permits or leaves the firearm accessible to children.'") Likewise, other jurisdictions have rejected this view, finding policy decisions to extend liability are properly made by the legislature, and not the courts. *See Bridges,* 742 S.E.2d at 798; *McGrane v. Cline,* 973 P.2d 1092, 1094-95 (Wash.App.1999); *Resteiner v. Sturm, Ruger & Co.,* 566 N.W.2d 53, 56 (Mich.App.1997).

{¶ 66} In weighing policy considerations regarding gun ownership and the conduct of third parties, imposing liability without a special relationship would amount to strict liability for gun owners, without any corresponding legislative enactment. Current law imposes liability only where a claimant demonstrates a special relationship, either through premises liability law based on prior, similar incidents and "somewhat overwhelming" circumstances, or based on an actual, special relationship of the type recognized under common law.

{¶ 67} In weighing policy considerations regarding mental illness, we find appellants' argument, in favor of abandoning precedent and imposing a new duty in these types of circumstances, equally unpersuasive. The new duty appellants propose would require this court to create a rational rule to address a range of irrational behaviors, forcing guardianship responsibilities on an individual who has not accepted such a legal

32.

responsibility over another. *See e.g. Frederic v. Willougby,* 11th Dist. Portage No. 2007-P-0084, 2008-Ohio-3259, ¶ 30 (requiring a guardianship, or circumstances in which the parent overtly accepts legal responsibility for an adult child, to impose a special relationship).

{¶ 68} Furthermore, appellants' argument fails to clearly identify the specific circumstances such a new duty would address, in either case. If it were the firearm, or the instrumentality, the new duty would essentially create strict liability for gun owners, based on facts that also indicated Blair owned and could have used his own gun. Such analysis ignores the fact that, in this case, Blair also used a lawn mower in his attack on Ciotto. If it is the mental illness, the new duty could create liability based on the very difficulties that cause adult children to move back home, influencing parents to turn their children away rather than provide a safe haven during difficult times. The instrumentality, additionally, would be irrelevant if mental illness created this new duty, with a duty to act to prevent use of every conceivable kind of weapon, including everyday items such as kitchen knives, tools, baseball bats, and even automobiles.

{¶ 69} In considering appellants' argument, they do not clearly focus on firearm ownership or mental illness, but argue liability for the tragic death of their decedent, relative to both. We must consider the broader consequences of creating such a new duty, unmoored from any clear focus. Additionally, appellants seek to hold appellee liable based mainly on the undisputedly horrific crime committed by Blair, not based on existing law. Despite Blair's reprehensible conduct, appellee had no basis to foresee the murder, and therefore, existing law imposed no duty on appellee to secure her firearm in

33.

her own home to prevent Blair's access, lacking some special relationship. As considered by the court in *Knight,* policy considerations related to the care of the mentally ill and a de facto "special relationship" based on these circumstances, weigh against such a policy-based duty.

{¶ 70} Additionally, imposing liability in this instance, based on these facts, could set a dangerous precedent with unintended consequences. If family members must exert control over each other to safely associate, they might hesitate to care for each other if doing so subjected them to liability based on odd behavior, reclusiveness, or alcohol abuse. For this reason, duty founded in policy considerations requires broader analysis than a single, albeit tragic, incident. More importantly, we must resist the temptation to address the tragedy in this case by fashioning new law that punishes appellee, but disregards any future implications. Instead, appellants' concerns are more properly the subject of a legislative response, where the forum encourages, and indeed requires, vigorous debate of the broad considerations, eliciting and weighing the societal factors, and only then creating new law that imposes new duties on the community at large.

{¶ 71} Therefore, after considering the policy argument, and finding no duty applicable to appellee's conduct, we decline to make new law with this case. Accordingly, we reject appellants' argument in favor of applying current law. Despite the tragedy that resulted in this instance, claims predicated on premises liability or nonfeasance still require a special relationship in order to impose liability, with public policy considerations, combined with argument of foreseeability, insufficient to create a new and separate legal duty.

**{¶ 72}** Accordingly, we find the trial court did not err in granting summary judgment as to this issue, and appellants' first assignment of error is overruled.

### B. Special relationship

**{¶ 73}** Appellants next argue that a special relationship did exist between appellee and Blair based on appellee's permitted use of her premises and/or based on appellee's custodial relationship with her mentally ill son.

### 1. Use of premises

**{¶ 74}** First, appellants contend that appellee owed a duty to others like Ciotto as a possessor of property, because she permitted Blair to "use the premises," and could have exerted control over Blair to protect Ciotto. As provided by Restatement of the Law, 2d, Torts, Section 318:

> If the actor permits a third person to use land or chattels in his possession otherwise than as a servant, he is, if present, under a duty to exercise reasonable care so to control the conduct of the third person as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if the actor
>
> (a) knows or has reason to know that he has the ability to control the third person, and
>
> (b) knows or should know of the necessity and opportunity for exercising such control.

35.

{¶ 75} In support of this special relationship, appellants again compare this case to the facts in *Volpe,* arguing appellee permitted Blair to use her premises, and failed to control her mentally ill, adult son's actions after providing him access to her firearm. However, appellants misstate the facts upon which the *Volpe* court relied.

{¶ 76} Appellants argue that the mother in *Volpe* negligently allowed her son to access guns on her property, which he used to kill her next-door neighbor. The *Volpe* court, however, considered that the mother permitted her mentally ill, adult son to use her premises to amass and store his own gun collection. *Volpe,* 821 A.2d at 702-703. In other words, the court in *Volpe* determined that the mother permitted her son to use her premises to conduct a dangerous activity.

{¶ 77} In *Volpe,* "the mother's liability derived from her status as a possessor of land." *Havel v. Chapek,* 11th Dist. Geauga No. 2004-G-2609, 2006-Ohio-7014, ¶ 59. In the present case, appellants argue that liability arises from negligence in securing the loaded handgun, or in other words, appellee's liability derives from her status as a possessor of a firearm. Furthermore, appellants do not claim that appellee permitted Blair to use her handgun. Therefore, even presuming this authority applied in this case, the facts are easily distinguishable from the facts in *Volpe.*

{¶ 78} Here, appellee only permitted Blair to use her premises as housing, and not to amass a cache of weapons that made appellee's premises dangerous to others. In fact, Blair left appellee's premises to commit the criminal act. The duty to control the conduct of another occupying one's premises ends once that person exits the premises, "outside the purview of the owner's control." *Gelbman v. Second Natl. Bank,* 9 Ohio St.3d 77, 80, 36.

458 N.E.2d 1262 (1984). Based on these facts, therefore, appellee owed no duty arising from a special relationship, based on premises liability as stated in Restatement of the Law, 2d, Torts, Section 318.

### 2. Control over another

{¶ 79} Appellee also owed no duty arising from her "control" over Blair. Appellants argue that appellee had a special relationship with Blair because she had "taken charge" of his care and permitted him to live with her, and she was therefore required to exercise control over Blair and his dangerous propensities. As provided by Restatement of the Law, 2d, Torts, Section 319:

> One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.

{¶ 80} There is no dispute regarding Blair's status as an emancipated adult, and no evidence of any court-ordered guardianship over Blair. Appellee, also, did not assert control over Blair's life, consistent with a guardianship. Instead, the evidence demonstrates that appellee and Blair had a familial relationship, and appellee provided Blair with food and shelter after he lost his job. Appellee was aware that Blair suffered from some mental condition, but demonstrated no knowledge of any violent tendencies, and "suffering from a mental illness does not automatically equate violent behavior." *Blevins,* 5th Dist. Richland Nos. 12CA116, 12CA115, 2013-Ohio-3297, ¶ 47. The fact that Blair became a recluse in her home appears Blair's own choice, and while appellee

37.

suggested Blair seek mental health treatment, the evidence demonstrates no ability, on the part of appellee, to compel treatment or otherwise control any aspect of Blair's life.

{¶ 81} "While the relationship between a parent and an adult child *may*, under certain circumstances, be a 'special relationship' that instills in the parent a duty to protect others from the violent propensities of the adult child, such a relationship does not exist automatically by virtue of the parent-child relationship itself." (Emphasis sic.) *Shirdon v. Houston*, 2d Dist. Montgomery No. 21529, 2006-Ohio-4521, ¶ 18. A parent must accept such responsibility "in a legally recognized way, such as a guardianship, or in a situation where an adult child's dependence and the parent's overt acceptance of responsibility for the adult child establish a de facto guardianship." *Id*.; *accord Frederic*, 11th Dist. Portage No. 2007-P-0084, 2008-Ohio-3259 at ¶ 30.

{¶ 82} Construing the present facts, Section 319 does not apply, as this Section is limited to circumstances in which there is both the authority and the ability to exert control over an adult child. *Blevins,* 2013-Ohio-3297, ¶ 45, quoting *Havel,* 2006-Ohio-7014 at ¶ 59; *see also Knight,* 133 So.3d at 1146-1147 (Fla.App.2014) (despite financial support and control over some aspects of their son's life, parents had no legal right to assert control, and therefore, no legal liability based on a custodial relationship). Lacking any evidence of authority, appellee owed no duty to appellants based on a special relationship that arose through "taking control" of her son.

{¶ 83} With no special relationship, therefore, appellants' second assignment of error is overruled.

38.

## C. Emotional Distress

{¶ 84} Appellants' assignments of error three and four challenge the trial court's ruling as to their emotional distress claims. They argue that appellee's conduct after the shooting demonstrates issues of fact, precluding summary judgment. Appellants asserted claims for negligent infliction of emotional distress and for intentional infliction of emotional distress, arguing the mishandling of a corpse as special circumstance for each claim.

{¶ 85} Generally, a claim for negligent infliction of emotional distress requires evidence demonstrating: "(1) the plaintiff was a bystander; (2) the plaintiff reasonably appreciated the peril which took place, whether or not the victim suffered actual physical harm; and (3) the plaintiff suffered serious emotional distress as a result of this cognizance or fear of peril." *Walker v. Firelands Cmty. Hosp.,* 170 Ohio App.3d 785, 2007-Ohio-871, 869 N.E.2d 66, ¶ 59 (6th Dist.), citing *Paugh v. Hanks*, 6 Ohio St.3d 72, 80, 451 N.E.2d 759 (1983). In special circumstances, however, damages are also available for emotional distress that results "from the negligent mishandling of a dead body." *Id*. at ¶ 43, citing *Carney v. Knollwood Cemetery Assn.,* 33 Ohio App.3d 31, 514 N.E.2d 430 (8th Dist.1986), paragraph two of the syllabus.

> The elements of a claim for intentional infliction of emotional distress are:
>
> (1) that the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff;

39.

(2) that the actor's conduct was so extreme and outrageous as to go 'beyond all possible bounds of decency' and was such that it can be considered as 'utterly intolerable in a civilized community,' * * *

(3) that the actor's actions were the proximate cause of plaintiff's psychic injury; and

(4) that the mental anguish suffered by plaintiff is serious and of a nature that 'no reasonable man could be expected to endure it,' *** . *Rine v. Sabo,* 113 Ohio App.3d 109, 118, 680 N.E.2d 647 (6th Dist.1996), quoting *Pyle v. Pyle*, 11 Ohio App. 3d 31, 34, 463 N.E.2d 98 (8th Dist.1983).

{¶ 86} Appellants argue that special circumstances exist in this case, based on appellee's failure to report the location of Ciotto's remains to authorities. The parties dispute whether appellee saw a body on the lawn, but in opposing summary judgment, appellants presented no evidence to refute appellee's testimony that she did not see a body. Even if appellee saw a body, moreover, a failure to call police is not the equivalent of mishandling a corpse. "Mishandling" implies there was some kind of "handling" of the decedent's body to begin with, with no allegations or evidence to support this notion. In support of their claim, appellants cite to no authority that permits a "mishandling" claim where the wrongdoer took no action. Instead, appellants rely on authority demonstrating affirmative mistreatment of a body. *See e.g. Chesher v. Neyer,* 392 F.Supp.2d 939, (S.D.Ohio 2005).

{¶ 87} A failure to call police or report the body, furthermore, could not constitute extreme and outrageous conduct unless appellee was first obligated to act. *See e.g.*

*Hartman v. Smith,* 9th Dist. Wayne No. 04CA0079, 2005-Ohio-3299, ¶ 23 (where there was no duty to report the location of a murder victim's remains, the failure to disclose was not actionable in a claim arising from emotional distress). Appellee's initial concealment of the murder weapon and lies, moreover, do not rise to the level of outrageous conduct, intended to cause emotional distress. Additionally, while appellants' reference to appellee's criminal actions could be construed as an attempt to demonstrate a consciousness of guilt, we find no authority that treats such conduct, related to a separate criminal proceeding, as an admission for purposes of proving appellants' emotional distress claims. Evidence of appellee's prior conviction, for conduct related to Blair's murder prosecution, has no relevance in this matter, and her conduct in hindering the criminal investigation, while wrongful, "is not extreme and outrageous simply because it is criminal[.]" *Morrow v. Reminger & Reminger Co. LPA,* 183 Ohio App.3d 40, 2009-Ohio-2665, 915 N.E.2d 696, ¶ 49 (10th Dist.).

{¶ 88} To sustain a claim for intentional infliction of emotional distress, appellants must allege conduct that goes beyond hurtful, inconsiderate, and unkind, to meet the threshold of conduct characterized by malice or "'a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.'" *Reamsnyder v. Jaskolski,* 10 Ohio St.3d 150, 153, 462 N.E.2d 392 (1984), quoting Restatement of the Law, Second, Torts 46, 71, 73 (1965). In this case, appellants allege appellee's criminal conduct, standing alone, meets this threshold, with no evidence of the type of intentional, malicious conduct required to sustain a claim.

41.

**{¶ 89}** Accordingly, having considered appellants' claims seeking damages for emotional distress, we find the trial court did not err in finding no issues of material fact and granting summary judgment for appellee. Appellants' third and fourth assignments of error, accordingly, are overruled.

### III. Conclusion

**{¶ 90}** Upon careful review of the proceedings, we affirm the judgment of the Huron County Court of Common Pleas, granting summary judgment in favor of appellee on appellants' claims. Appellants are assessed the costs of appeal, as provided by App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Arlene Singer, J. _____

_____
JUDGE

Gene A. Zmuda, J. _____
CONCUR.

_____
JUDGE

Christine E. Mayle, P.J.,
DISSENTS.

**MAYLE, P.J.**

**{¶ 91}** Respectfully, I dissent. I cannot agree that Hinkle owed absolutely *no* duty, as a matter of law, when storing her loaded handgun—"an inherently dangerous

42.

instrumentality, the use of which is reasonably likely to produce death"[10] —under the facts of this case. Consistent with well-established tort law, I would find that Hinkle owed a common-law duty to exercise the degree of care that an ordinarily reasonable and prudent person would exercise under the same or similar circumstances. In other words, I would hold that Hinkle's act of storing her handgun required the same amount of care that the law requires for any other affirmative act—ordinary care that is reasonable under the circumstances. Here, this required Hinkle to take into account what she knew about her son, who lived with her: that he was mentally unstable, heard voices, abused alcohol, harbored irrational anger toward neighbors, and that he was not only aware of the location of the loaded gun, but that he had taken the gun on prior occasions—even after she told him not to—and fired it off her back porch while intoxicated.

{¶ 92} I would find that under the facts of this case—when viewed in a light most favorable to the non-moving party, as required under Civ.R. 56—the question of whether Hinkle breached her common law duty of ordinary care by storing her loaded gun where her son could easily access it is a question of fact for a jury.

### I. Determining Whether a Duty Exists

{¶ 93} The majority correctly observes that the duty element of a negligence claim may be established by common law, legislative enactment, or the particular

---

[10] *State v. Widner*, 69 Ohio St.2d 267, 270, 431 N.E.2d 1025 (1982); *State v. Seiber*, 56 Ohio St.3d 4, 14, 564 N.E.2d 408 (1990); *State v. Dunlap*, 73 Ohio St.3d 308, 316, 652 N.E.2d 988 (1995).

43.

circumstances of a case. *Wallace v. Ohio DOC*, 96 Ohio St.3d 266, 2002-Ohio-4210, 773 N.E.2d 1018, ¶ 23. "[A] defendant's duty to a plaintiff depends upon the relationship between the parties and the foreseeability of injury to someone in the plaintiff's position." *Simmers v. Bentley Constr. Co.*, 64 Ohio St.3d 642, 645, 597 N.E.2d 504 (1992). The imposition of a duty may also be justified in particular circumstances based on "the guidance of history, our continually refined concepts of morals and justice, the convenience of the rule, and social judgment as to where the loss should fall." *Wallace* at ¶ 24.

### A.  Premises liability is not at issue.

{¶ 94} The majority assumes that this case involves a "premises liability" claim (rather than a common law negligence claim) because Ciotto alleges that Hinkle negligently stored her handgun in her home. While Ciotto used the word "premises" in her complaint—alleging that Hinkle had "a duty to use ordinary care in controlling and maintaining her *premises*;" Hinkle allowed Blair "to store firearms on her *premises*;" Hinkle knew that Blair "stored firearms on her *premises*"—her theory of negligence is not rooted in premises liability law, which is inapplicable to this case because the injured party, Linda Ciotto ("Linda"), was not injured upon Hinkle's premises.

{¶ 95} "In a premises liability case, the relationship between the owner or occupier of the premises and the injured party determines the duty owed." *Martin v. Lambert*, 2014-Ohio-715, 8 N.E.3d 1024, ¶ 18 (4th Dist.). The duty owed varies based on the *injured party's* common-law status as either a licensee, invitee, trespasser, or social guest *on a premises* that is owned or controlled by the defendant. *See Combs v.*

44.

*Ohio Dept. of Nat. Resources, Div. of Parks & Recreation*, 146 Ohio St.3d 271, 2016-Ohio-1565, 55 N.E.3d 1073, ¶ 14. That is, "a plaintiff's presence on premises in the possession and control of the defendant at the time of the injury determines whether a negligence cause of action under a premises liability theory is applicable." *A.M. v. Miami Univ.*, 2017-Ohio-8586, 88 N.E.3d 1013, ¶ 36-37 (10th Dist.). Linda was not murdered on Hinkle's property; she was murdered on her own property. Premises liability is not applicable.

{¶ 96} Although a case cited by the majority, *Hall v. Watson*, 7th Dist. Mahoning No. 01 CA 55, 2002-Ohio-3176, ¶ 17, states that "[c]ourts have applied premise [sic] liability in situations where a child has removed explosives from the property of another and injured himself/herself with the explosives" citing *Bridges v. Dahl,* 108 F.2d 228 (6th Cir.1939), there are several problems with that case. First, the *Bridges* court (which *Hall* relies upon) did not engage in a traditional premises-liability analysis or address the significance of the injury occurring off the premises. Rather, it recognized that an "owner or occupant of land is bound to exercise ordinary care commensurate with the danger, to avoid injury to children where he maintains on his property dangerous explosives in places where they are accustomed to resort for play or other purposes and where their presence could be anticipated by the exercise of ordinary care." *Id.* at 230. The present case does not involve any such issues.

{¶ 97} Second, the strained application of traditional premises liability in *Hall* is especially problematic given the context in which the injury arose. In that case, an 11-year-old child took a gun from the home of the gun-owner defendant (the child's adult

45.

cousin), who resided with his parents, and the child then brought the gun to his mother's house, where he and his 15-year-old brother hid it. A few weeks later, a third child (a 10-year-old cousin of the two brothers) was visiting the two brothers, and the 15-year-old child—whose brother stole the gun from the other property— negligently shot and killed his 10-year-old cousin.

{¶ 98} The *Hall* court incorrectly presumed that the potential liability of the gun-owner defendant somehow depended upon whether the 11-year-old child—*who was not the injured party*—was a trespasser, licensee, invitee, or social guest (under traditional premises liability principles) when he stole the gun that was eventually used, weeks later, by someone else (his brother) to kill *another* someone else (the brothers' cousin) on yet *another* someone else's property (the brothers' mother's house). *Hall* at ¶ 17-28. Notably, the *Hall* court determined that a jury should determine whether, under that fact scenario, such injury was foreseeable to the gun-owner. *Id.* at ¶ 32 ("The jury is in the best position to determine whether Brett leaving his gun in a closed, but unlocked ammunition box in his open closet and hidden under some clothes could have anticipated that one of the children who frequented his home would handle the gun and cause injury or death."). Regardless, in my view, the *Hall* court improperly applied premises liability to analyze the liability of the gun-owner. Instead, I believe that premises liability would have been applicable to determine the liability of the owner of the premises where the 10-year-old was killed (i.e., the mother of the two brothers) and, if analyzed, the mother's liability would have depended upon whether *the deceased child* was a trespasser, licensee, invitee, or social guest *on that premises* at the time of the shooting.

46.

{¶ 99} In any event, Linda was not injured upon—and never even entered—Hinkle's property. This is not a premises liability case, and Hinkle concedes as much in her brief.[11] The majority's characterization of Ciotto's theory of negligence as one for "premises liability" appears to stem from a misunderstanding of her *alternative* argument: that Hinkle may be liable for failing to control Blair's conduct because there existed "a special relationship" between Hinkle and Blair arising from Hinkle's status as a landowner and Blair's status as a person permitted to use her premises. Ciotto cites as authority for this position the Restatement of the Law of Torts 2d, section 318 (1965), which provides:

> If the actor permits a third person to use land or chattels in his possession otherwise than as a servant, he is, if present, under a duty to exercise reasonable care so to control the conduct of the third person as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if the actor

---

[11] Hinkle emphasizes that "James Blair murdered Linda Ciotto on Linda Ciotto's property. * * * In *Simpson* [*v. Big Bears Stores Co*., 73 Ohio St.3d 130, 652 702 (1995), syllabus], the Supreme Court expressly states that a landowner's 'duty does not extend to premises not in the possession and control of the business owner.' * * * In this case, it is undisputed the criminal actions of James Blair occurred off Appellant's property and on the property owned by Ms. Ciotto."

47.

(a) knows or has reason to know that he has the ability to control the third person, and

(b) knows or should know of the necessity and opportunity for exercising such control.[12]

{¶ 100} The majority acknowledges Ciotto's "special relationship" argument under section 318, but mistakes the "special relationship" alleged by Ciotto as Hinkle's "status as a possessor of a firearm," rather than what Ciotto actually argued: Hinkle's status as a landowner. Ciotto's claim is not rooted in premises liability.

{¶ 101} As I explain below, while I agree that Ciotto does not establish a "special relationship" that is sufficient to support the negligence claims against Hinkle that are based upon her alleged *non*feasance (i.e., Hinkle's failure to control her son and prevent his criminal actions), Ciotto clearly alleges a common-law negligence claim that is based upon Hinkle's own purported *mal*feasance (i.e., Hinkle's practice of storing her loaded

---

[12] The Supreme Court of Rhode Island relied on this theory in finding a legal duty in *Volpe v. Gallagher,* 821 A.2d 699 (R.I. 2003). *Volpe* resembles the present case in many ways, however, the perpetrator in *Volpe* murdered his neighbor using his *own* gun that he stored at his mother's home while living with her. His mother had allowed him to store various firearms and ammunition in the home, despite being aware that he was mentally ill. The court concluded that "by virtue of her ownership and possession of the property where [her son] not only kept his guns and ammunition, but also where he resided, and by virtue of [her] own professed ability to remove the guns herself if her son failed to abide by her directive to do so, defendant did have control over [her son's] ability to keep these deadly instrumentalities on her property." *Id.* at 715. For that reason, I do not believe that *Volpe* is analogous to this case.

48.

handgun in her bedside table drawer) and that negligence claim does not require a "special relationship" of any kind.

## B. A "special relationship" is not required.

{¶ 102} In certain types of negligence actions, such as actions based on the failure to act for another's protection or the failure to control the conduct of a third person, a duty will arise only where a "special relationship" exists between the plaintiff and defendant or the defendant and the third-party actor. *Fed. Steel & Wire Corp. v. Ruhlin Constr. Co.*, 45 Ohio St.3d 171, 173, 543 N.E.2d 769 (1989). A classic example is that an expert swimmer, with a boat and rope at his disposal, is under no duty to save a drowning man. *Estates of Morgan v. Fairfield Family Counseling Ctr.*, 77 Ohio St.3d 284, 293, 673 N.E.2d 1311 (1997), fn. 2. The trial court focused on the absence of a "special relationship" in concluding that Hinkle owed no duty to Linda. It observed that no parent-minor child, master-servant, innkeeper-guest, custodian-ward, common carrier-passenger, employer-employee, or any similar relationship existed giving rise to a duty *to act* for the protection of others.

{¶ 103} But Ciotto's primary allegation centers on Hinkle's own affirmative action—i.e., her practice of storing her loaded handgun in a drawer of her bedside table—rather than her failure to act to control her son. The majority's discussion of Ciotto's affirmative conduct is constrained to a discussion of "premises liability" (which, for reasons already discussed, I do not believe is at issue in this case) and overlooks the allegations in the complaint that allege a common-law negligence claim. That is, Ciotto alleges that Hinkle owed a duty to store her handgun in a manner that was reasonable

49.

under the circumstances, and, she claims, under the circumstances of this case, it was not reasonable to store her loaded handgun in an unlocked drawer, its location well-known to Blair.

{¶ 104} The majority concludes that "Ohio authority provides for no common law duty to secure a firearm, so as to prevent access and use by an emancipated adult." It insists that we would be creating a "new" duty if we were to hold otherwise. But it is fundamental that "[a] person is to exercise that care necessary to avoid injury to others." *Mussivand v. David*, 45 Ohio St.3d 314, 318-319, 544 N.E.2d 265 (1989); *Cameron v. Univ. of Toledo*, 2018-Ohio-979, 98 N.E.3d 305, ¶ 56 (10th Dist.). *See also Drew v. Gross*, 112 Ohio St. 485, 491, 147 N.E. 757 (1925) ("[T]he law imposes upon every person the duty of using his own property so as not to injure his neighbor."). "Each person has a duty to engage in her daily activities using a certain amount of care." *Boyd v. Moore*, 184 Ohio App.3d 16, 2009-Ohio-5039, 919 N.E.2d 283, ¶ 10 (2d Dist.). I see no reason why a person should be absolved of exercising due care when the affirmative conduct at issue is the storage of a firearm.[13]

---

[13] In *Estate of Heck v. Stoffer*, 786 N.E.2d 265 (Ind.2003), the defendants argued that "recognition of a duty of reasonable and ordinary care in this case will create a 'new and never-before recognized cause of action.'" *Id.* at 270. "Not so," the Indiana Supreme Court responded. *Id.* "The cause of action is negligence, and the duty of care is well established—that care which is reasonable under the circumstances." *Id.* While it is true, as the majority decision points out, that the Indiana legislature later enacted a statute that limits common-law civil liability under certain circumstances involving theft of a firearm, no conflicting statute existed at the time the case was decided. Likewise, no conflicting Ohio statute currently limits civil liability under the circumstances of this case.

50.

{¶ 105} This is especially true given the great potential for harm when a gun falls into the wrong hands. The Supreme Court of Ohio has long recognized that "[t]he law requires of persons having in their custody instruments of danger that they should keep them with the utmost care." *Pittsburgh, C. & St. L.R. Co. v. Shields*, 47 Ohio St. 387, 392, 24 N.E. 658 (1890). Although a gun may not constitute a "dangerous ordnance" as defined by the Revised Code (as noted in the majority opinion), the Supreme Court of Ohio has deemed it "an inherently dangerous instrumentality, the use of which is reasonably likely to produce death." *Widner*, 69 Ohio St.2d at 270, 431 N.E.2d 1025; *Seiber*, 56 Ohio St.3d at 14, 564 N.E.2d 408; *Dunlap*, 73 Ohio St.3d at 316, 652 N.E.2d 988. *See also Stoffer* at 271 ("Guns are dangerous instrumentalities that in the wrong hands have the potential to cause serious injuries."). Given that the Supreme Court of Ohio has affirmatively recognized that a gun is an inherently dangerous instrumentality, reasonably likely to produce death, it seems inconsistent to conclude that a gun owner owes no duty, as a matter of law, to safeguard this inherently dangerous instrumentality in any manner whatsoever.

{¶ 106} Ohio appellate courts have recognized the inherently dangerous nature of firearms when analyzing one's duty of care with respect to his or her own firearms in certain situations. In *Byers v. Hubbard*, 107 Ohio App.3d 677, 683, 669 N.E.2d 320 (8th Dist.1995), the appellate court recognized that "[t]he inherently dangerous nature of the weapon imposes an obligation upon its owner to act responsibly when entrusting the gun to another to guard against injury occurring to a third party." Under some circumstances, Ohio courts have recognized that negligent entrustment of a gun may also include merely

*allowing access* to the gun. *Nearor v. Davis*, 118 Ohio App.3d 806, 813, 694 N.E.2d 120 (1st Dist.1997), citing *McGinnis v. Kinkaid*, 1 Ohio App. 3d 4, 9, 437 N.E.2d 313 (8th Dist.1981).

{¶ 107} The majority distinguishes these cases on the grounds that they involved "an affirmative act." But, in my opinion, the physical act of placing a loaded gun in a bedside table drawer or another person's hands—or anywhere else for that matter—is "an affirmative act." Moreover, as *Byers* expressly recognizes, negligent entrustment is merely "*[o]ne example*" of a negligent act that could create an unreasonable risk of harm to others. *Byers* at 683, quoting Restatement of the Law 2d, Torts, Section 302B (1965).

{¶ 108} The majority also cites R.C. 2923.21 ("improperly furnishing firearms to minors"), R.C. 2923.16 ("improperly handling firearms in a motor vehicle"), and R.C. 2923.19 ("failure to secure dangerous ordnance"), suggesting that these are the only statutes creating duties relative to securing or storing weapons. But these statutes impose *criminal* liability for furnishing firearms to children, improperly handling a firearm in a motor vehicle, or failing to secure a weapon that qualifies as a "dangerous ordnance." It is well settled that "there are no common-law crimes in Ohio," *Toledo Disposal Co. v. State*, 89 Ohio St. 230, 236, 106 N.E. 6 (1914), and "[n]o conduct constitutes a criminal offense against the state unless it is defined as an offense in the Revised Code." R.C. 2901.03(A). Although an act cannot be criminal unless defined as an offense by the legislature, it is axiomatic that an act need not be *criminal* before it may be actionable in *tort*. *See State v. Broughton*, 51 Ohio App.3d 10, 553 N.E.2d 1380 (12th Dist.1988) fn. 2, citing Keeton, Dobbs, Keeton & Owen, *Prosser and Keeton on the Law of Torts*, 52.

Section 2, 7-8, (5 Ed.1984) ("What may be a crime need not be a tort and what is a tort need not be a crime.").

{¶ 109} These criminal statutes say nothing of one's *civil,* common-law liability for harm that results when a gun owner fails to exercise the degree of care that an ordinarily reasonable and prudent person would exercise under the same or similar circumstances when acting to store one's firearm.[14] Importantly, it is also well-recognized in Ohio that the legislature will not be presumed to have intended to abrogate the common law "unless the language employed by it clearly expresses or imports such intention." (Internal citations and quotations omitted.) *Danziger v. Luse,* 103 Ohio St.3d 337, 2004-Ohio-5227, 815 N.E.2d 658, ¶ 11. The criminal statutes cited by the majority express no such intent. While the Ohio legislature would certainly be within its lawmaking power to enact a statute that limits, or even abrogates, the otherwise-applicable common law duty of ordinary care under the circumstances of this case, it has not done so. In the absence of such legislation, the common law controls.

{¶ 110} In my view, under Ohio law, there is a common-law duty to exercise ordinary care, reasonable under the circumstances, when storing one's firearm—just as there is a generally-applicable duty to exercise ordinary care, reasonable under the circumstances, when taking any other affirmative action. Moreover, this duty to act with ordinary, reasonable care when storing one's firearm is not tied to any special

---

[14] The Florida and Maryland statutes cited by the majority also address criminal—not *civil* liability.

53.

relationship requiring the protection of another or control of a third-person's conduct. *See, e.g. Cincinnati v. Beretta U.S.A. Corp.*, 95 Ohio St.3d 416, 2002-Ohio-2480, 768 N.E.2d 1136, ¶ 19 (explaining that "special relationship" rule was not determinative of duty where plaintiff alleged that defendant gun manufacturers were themselves negligent by "manufacturing, marketing, and distributing firearms in a way that creates an illegal firearms market that results in foreseeable injury," and not that defendant owed a duty to control the conduct of third parties).

{¶ 111} Although the majority suggests that Ohio courts recognize a duty to safely store one's firearm *only* where a special relationship exists, the cases it cites fall well short of this. In *Blevins v. Hartman,* 5th Dist, Richland No. 12CA116, 2013-Ohio-3297, for instance, the gun that was used to kill the decedents was stored at the defendant-parents' home, but the gun belonged to the adult perpetrator. The court framed the issue as "whether there was a duty on the parents *to prevent their adult son from causing harm to another*," and the case turned in large part on the court's conclusion that the perpetrator's conduct was not foreseeable. (Emphasis added) *Id.* at ¶ 46. Similarly, in *Reddick v. Said,* 11th Dist. Lake No. 2011-L-067, 2012-Ohio-1885, ¶ 36-47, the plaintiff alleged that the defendants breached various common-law duties *to act to protect the victim* or *to control the conduct of a third party*. Thus, both *Blevins* and *Reddick* analyzed an allegedly negligent failure to act—which, I agree, requires a special relationship—and did not analyze (or even address) the common law duty to act with ordinary care when taking the affirmative conduct at issue here: the storage of a loaded firearm.

{¶ 112} The majority also expresses concern that to recognize a duty to safely store one's gun may create a new duty "to act to prevent use of every conceivable kind of weapon, including everyday items such as kitchen knives, tools, baseball bats, and even automobiles." This argument has been addressed by other courts. For instance, in *Irons v. Cole*, 734 A.2d 1052, 1058 (Conn.Super.Ct.1998), the Connecticut Superior Court explained that "[t]he duty involved is a duty to take reasonable precautions." It recognized that because "the primary purpose of guns is to inflict harm or kill," a jury may well find that what constitutes "reasonable precautions" in the handling of a gun may well differ from what constitutes "reasonable precautions" in the handling of "items with uses other than to inflict harm or kill." *Id.*

{¶ 113} In sum, I believe that there is a common-law duty to exercise ordinary care, reasonable under the circumstances, when storing one's firearm. Although such a duty may not yet have been *explicitly* recognized by any Ohio court in the context of storing firearms, I believe that this is nothing more than an application of well-established common-law negligence principles. The Restatement of the Law 2d, Torts, Section 302B (1965), for instance, observes that "[a]n act or an omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the conduct of the other or a third person which is intended to cause harm, even though such conduct is criminal." Similarly, the Restatement of the Law 3d, Torts: Liability for Physical and Emotional Harm, Section 19 (2010) recognizes that "[t]he conduct of a defendant can lack reasonable care insofar as it foreseeably combines with or permits the improper conduct of the plaintiff or a third party."

55.

**{¶ 114}** This leads to the next consideration necessary in determining whether a duty exists:  foreseeability.

### C.  Ohio courts consider foreseeability in determining whether a duty exists.

**{¶ 115}** The Ohio Supreme Court has recognized that "[t]he concept of foreseeability is an important part of all negligence claims, because '[t]he existence of a duty depends on the foreseeability of the injury.'"  *Cromer v. Children's Hosp. Med. Ctr. of Akron*, 142 Ohio St.3d 257, 2015-Ohio-229, 29 N.E.3d 921, ¶ 24, quoting *Menifee v. Ohio Welding Products, Inc.*, 15 Ohio St.3d 75, 77, 472 N.E.2d 707 (1984).  The trial court effectively ignored the role of foreseeability in determining the existence of a duty here.[15]

**{¶ 116}** As a society, we expect people to exercise reasonable precautions against risks that a reasonably prudent person would anticipate, but not against those that a reasonable person would not anticipate.  *Id.*  Where "a reasonably prudent person would have anticipated that an injury was likely to result from a particular act," the court may find that a duty exists.  *Wallace*, 96 Ohio St.3d 266, 2002-Ohio-4210, 773 N.E.2d 1018, at ¶ 23.  Such duty usually arises from the foreseeability of injury to someone in the plaintiff's "general situation."  *Cromer* at ¶ 24, citing *Gedeon v. E. Ohio Gas Co.,* 128 Ohio St. 335, 339, 190 N.E. 924 (1934).  *Jeffers v. Olexo*, 43 Ohio St.3d 140, 142, 539

---

[15]  The trial court acknowledged some of the facts relevant to a foreseeability analysis, but its conclusion was not that the injury was not foreseeable; its conclusion was that no special relationship existed.

56.

N.E.2d 614 (1989) ("Whether a duty exists depends largely on the foreseeability of the injury to one in the plaintiff's position.").

{¶ 117} As a general rule, one is not expected to foresee the criminal conduct of a third party. *Ash v. R.C. Hendrick & Sons, Inc,* 6th Dist. Lucas No. L-85-127, 1985 WL 8194, *1 (Oct. 11, 1985). But there are exceptions to this general rule and situations in which an actor, as a reasonable person, "is required to anticipate and guard against the intentional, or even criminal, misconduct of others." *Evans v. Ohio State Univ.*, 112 Ohio App.3d 724, 761, 680 N.E.2d 161 (10th Dist.1996) (Lazarus, J., dissenting), citing Restatement of the Law 2d, Torts, Section 302B, Comment e (1965). Moreover, a duty may arise "where the actor's own affirmative act has created or exposed the other to a recognizable high degree of risk of harm through such misconduct, which a reasonable man would take into account." *Id. See also* Restatement of the Law 3d, Torts: Liability for Physical and Emotional Harm, Section 7(a) (2010) ("An actor ordinarily has a duty to exercise reasonable care when the actor's conduct creates a risk of physical harm."); *Parker v. L.T.*, 1st Dist. Hamilton No. C-160642, 2017-Ohio-7674, ¶ 20, ("[A]ctors engaging in conduct that creates a risk to others have a duty to exercise reasonable care to avoid causing physical harm.").

{¶ 118} This principle, as reflected in the Restatement of the Law 2d, Torts, Section 302B (1965), Restatement of the Law 3d, Torts: Liability for Physical and Emotional Harm, Sections 7(a) and 19 (2010), and various comments thereto, recognizes the defendant's role in creating the high risk of harm even though the ultimate injury to

57.

the plaintiff has been inflicted by the foreseeable misconduct of a third person.  The Ohio Supreme Court has found the existence of a duty under such circumstances.

{¶ 119} For instance, in *Fed. Steel & Wire Corp.*, 45 Ohio St.3d at 176-77, 543 N.E.2d 769, the Supreme Court of Ohio considered the question of whether a construction company performing bridge repairs could be liable for negligence when third parties threw construction materials from the bridge, causing damage to property situated below.  The worksite had been the repeated object of vandals.  The company had taken security measures in the past, including hiring a guard, but did not employ a guard during the winter months when the damage to plaintiff's property occurred.  The construction company argued that it owed no duty to the plaintiff to control the criminal conduct of unknown third persons who were throwing construction material off the bridge. The court disagreed.  It concluded that under the facts and circumstances of the case, it was reasonably foreseeable to expect that vandalism on the company's job site would ultimately affect the plaintiff.  The court held that reasonable minds could have concluded that the defendant had a special duty to provide adequate measures to protect the plaintiff from reasonably foreseeable harm similar in nature to that already experienced on or initiated from the job site, and it held that this was an "issue that should have been submitted to the trier of fact." *Id.* at 178.

{¶ 120} The majority maintains that to establish foreseeability, Ciotto must point to facts demonstrating "somewhat overwhelming circumstances, sufficient to indicate that [Linda's] murder was likely."  It suggests that Hinkle owed no duty absent evidence that "Blair previously used [her] handgun to inflict harm 'similar in nature.'"  The

58.

majority concludes that Blair never engaged in conduct "similar in nature" that would demonstrate "somewhat overwhelmingly" that he would use Hinkle's firearm to murder their neighbor.

{¶ 121} Before specifically addressing the majority's position as to whether Hinkle could have foreseen that Blair would use her gun to shoot Linda, it should be observed that historically, "the issue of foreseeability has been viewed as a factor in both the duty element and proximate cause element of a negligence claim." *Wallace v. Ohio Dept. of Commerce, Div. of State Fire Marshal*, 10th Dist. Franklin No. 99AP-1303, 2003-Ohio-6935, ¶ 22. This dual consideration has led courts and commentators to characterize the concept of foreseeability as "troublesome," "confusing," "redundant," or "murky." *Oiler v. Willke*, 95 Ohio App.3d 404, 409, 642 N.E.2d 667, 671 (4th Dist.1994); Cardi, W. Jonathan, *Reconstructing Foreseeability*, 46 B.C.L. Rev. 921, 932 (2005); McClurg, Andrew, *Armed & Dangerous: Tort Liab. for the Negligent Storage of Firearms,* 32 Conn. L. Rev. 1189, 1226 (2000). In fact, "[t]he Third Restatement expressly rejects reliance on unforeseeability by courts as a basis for concluding that no duty exists," instead reserving issues of foreseeability for analysis by the fact-finder in determining whether a defendant's conduct was unreasonable and whether that conduct proximately caused the plaintiff's injury. Cardi, W. Jonathan & Green, Michael D., *Duty Wars*, 81 S. Cal. L. Rev. 671, 722 (2008), citing Restatement of Law (3d) Torts: Phys. & Emot. Harm § 7 (2010) ("Despite widespread use of foreseeability in no-duty determinations, this Restatement disapproves that practice and limits no-duty rulings to articulated policy or principle in order to facilitate more transparent explanations of the

59.

reasons for a no-duty ruling and to protect the traditional function of the jury as factfinder.").

{¶ 122} Setting aside any debate as to the role of foreseeability in determining duty, the majority's foreseeability analysis relies on *premises liability* cases in which business owners—mainly store owners or bar owners—were held to have no duty to anticipate the particular criminal conduct giving rise to the injuries sustained by invitees on their property. In other words, the courts in those cases concluded that the business owners owed no duty to act for the protection of their invitees or to control the conduct of third parties. In those cases, the courts held that while prior crimes had occurred on the premises of the defendant-business owners, there had been no conduct signaling the potential for the type of criminal conduct that ultimately caused injury to the plaintiff-invitees. *See, e.g., Krause v. Spartan Stores, Inc.*, 158 Ohio App.3d 304, 2004-Ohio-4365, 815 N.E.2d 696, ¶ 36 (6th Dist.) (defendant grocery store owed no duty to business-invitee plaintiff assaulted in parking lot where only sufficient, relevant evidence to show that crime was foreseeable was one incident three years earlier); *Reitz v. May Co. Dept. Stores,* 66 Ohio App.3d 188, 583 N.E.2d 1071 (8th Dist.1990) (department store defendant had no reason to foresee that business invitee-plaintiff would be stabbed in department store parking lot where there had been only one prior similar incident three years earlier); *Stoner v. Montpelier Tavern,* 2017-Ohio-7995, 98 N.E.3d 1092, ¶ 41 (6th Dist.) (beating of business-invitee plaintiff not foreseeable to defendant bar where only six fights had occurred at back of bar over five-year period); *Philon v. Knerr,* 6th Dist. Erie No. E-11-011, 2012-Ohio-2342, ¶ 19 (despite prior incidents of arguments in

60.

parking lot, it was not foreseeable to convenience store defendant that one customer would intentionally strike second customer with his car).

{¶ 123} But as I explained earlier in this dissent, this case is not a premises liability case. Nor is it a case involving the mere failure to act for another's protection or to control the conduct of a third party. Thus, the cases cited by the majority requiring "somewhat overwhelming" circumstances demonstrating the likelihood of criminal conduct "similar in nature" have no applicability to the present analysis.

{¶ 124} Rather, given Ciotto's primary claim that Hinkle was negligent in storing her firearm—not in failing to act for Linda's protection or failing to control Blair—we must be guided not by whether there were "somewhat overwhelming" circumstances indicating that Blair would use Hinkle's gun to murder Linda, but by "the well-settled rule in Ohio" that a defendant will be liable where *an* injury was reasonably foreseeable. *Oiler*, 95 Ohio App.3d at 412, 642 N.E.2d 667. He or she need not foresee the particular harm or the severity of the injury that results from the negligent act. *Id.* In my view, Hinkle did not have to foresee that the "murder was likely," as stated by the majority.

{¶ 125} The harm to be anticipated from unsafely storing one's handgun is that the handgun will be used by an unauthorized third person to shoot another person, either negligently or intentionally. This is precisely the injury that befell Linda Ciotto. And to the extent that Blair's past conduct must be considered in determining the existence of a duty, it is important to remember that this court must construe those facts in favor of the non-moving party under Civ.R. 56. Here, construing all of the facts in Ciotto's favor, I

61.

believe that a reasonable factfinder could conclude that Blair's misuse of Hinkle's easily-accessible loaded handgun was reasonably foreseeable to Hinkle.

{¶ 126} Blair began living in Hinkle's home after he was laid off from his job, approximately 18 months before he murdered Linda. Hinkle acknowledged that Blair was an alcoholic, regularly drinking to the point of intoxication. He was not social, had few friends, and had become reclusive. In fact, Blair had not left the house at all in the nine months leading up to Linda's murder. Hinkle knew her son "wasn't quite right." He heard voices, he talked to himself, he believed the neighbors were watching him, and he was convinced that Linda wanted to "take him out"—even though, as far as Hinkle knew, her son had never interacted with Linda. Hinkle said that her son was "definitely" depressed and had threatened suicide. She observed that his drinking and strange behaviors were becoming worse and more noticeable. She was concerned about Blair and encouraged him numerous times to get help from a psychologist or psychiatrist.

{¶ 127} Hinkle kept her loaded revolver in an unlocked drawer in her nightstand. On at least two occasions, Blair took the revolver without her permission, while drinking, and fired shots from the deck of her home. After the first incident, Hinkle warned her son to leave the gun alone. He did not listen. Hinkle then caught him firing the gun from the deck at least one other time before the incident at issue. So, despite the fact that Blair had previously disobeyed her instructions and fired the gun, while intoxicated, from the deck of her home—in a populated residential neighborhood that included children and pets—she nonetheless continued her practice of storing her loaded gun in the same

62.

nightstand drawer. In her deposition, she conceded that she did not restrict Blair's access to her gun.

{¶ 128} Hinkle also knew that Blair had a "vendetta" against Linda. On the night of the murder, Blair was drinking beer and whiskey and was intoxicated. He was angry that Linda was mowing her lawn at night. He called her a "she-bitch" and flipped her off from the patio of Hinkle's home. Hinkle agreed that as a gun owner, she should store her firearm safely under the circumstances and keep it out of the hands of mentally unstable or intoxicated persons because it is foreseeable that "something bad" can happen or that someone may be harmed by a gun in the hands of a mentally unstable or intoxicated person. Nevertheless, despite knowing that her son was intoxicated and angry with the neighbor, Hinkle made no effort to hide her loaded gun. It remained in the unlocked nightstand drawer.

{¶ 129} Given what Hinkle knew about her son's mental condition, his alcohol abuse, his irrational anger toward Linda, and his prior misuse of her revolver, I do not believe that it may be said—as a matter of law—that Hinkle could not have reasonably foreseen that Blair would again misuse the gun and that his misuse of the gun posed a likelihood of harm to neighbors—and to Linda, in particular. *See Irons,* 734 A.2d at 1057 (finding that it was "certainly reasonably foreseeable that a person who is behaving in a delusional, angry manner and using force against others and who is trained in the use of guns will use a readily available gun to inflict harm.").

{¶ 130} The trial court found it important that Blair owned his own gun, which he kept at Hinkle's house. It is not clear from the record that Blair currently owned a gun

63.

that he kept at his mother's house. But even assuming that he did, there is nothing in the record indicating whether Blair's gun was operational, whether ammunition for the gun was readily available, or whether he ever fired his own weapon while living with Hinkle. The record indicates that on the occasions that Blair chose to shoot firearms from his mother's back patio while intoxicated, it was his mother's gun that he used. And it was his mother's gun that he used to kill Linda. On the record before this court, that Blair owned his own firearm has no bearing on the issue of duty.[16]

### D. Public policy counsels in favor of finding a duty.

{¶ 131} The Supreme Court of Ohio has observed that "the concept of duty in negligence law is at times an elusive one." *Wallace,* 96 Ohio St.3d 266, 2002-Ohio-4210, 773 N.E.2d 1018, at ¶ 24. "There is no formula for ascertaining whether a duty exists." *Id.,* quoting *Mussivand,* 45 Ohio St.3d at 314, 544 N.E.2d 265. "Duty * * * is the court's expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." (Internal citations and quotations omitted.). *Wallace* at ¶ 24.

{¶ 132} As alluded to earlier in this dissent, the imposition of a duty may be justified in particular circumstances based on "the guidance of history, our continually

---

[16] But, if Blair had used *his gun* to kill Linda, this would be a very different case. If that were the case and the facts were otherwise the same, it is likely that the only negligence at issue would be nonfeasance—i.e., the failure to control, monitor, and restrict Blair's use of his own firearm.

refined concepts of morals and justice, the convenience of the rule, and social judgment as to where the loss should fall." *Id*. Strong public policy may justify imposition of a legal duty. *See Mussivand*, 45 Ohio St.3d at 319, 544 N.E.2d 265 (concluding that strong public policy in favor of health of the people supported imposition of legal duty of persons with venereal diseases to abstain from sexual conduct or warn sexual partners); *McGill v. Newark Surgery Ctr.*, 113 Ohio Misc.2d 21, 37, 756 N.E.2d 762 (C.P.2001) (finding that "[t]he foreseeable risk of the resulting substantial harm, when weighed with the public policy concerns," gave rise to a duty on behalf of community blood bank to provide blood to persons in the community, even if those persons were not patients of the hospital).

{¶ 133} The Restatement of the Law 2d, Torts, Section 302B, Comment f (1965) provides guidance as to the particular circumstances justifying the imposition of a duty to take precautions against intentional or criminal misconduct:

> [I]t is a matter of balancing the magnitude of the risk against the utility of the actor's conduct. Factors to be considered are the known character, past conduct, and tendencies of the person whose intentional conduct causes the harm, the temptation or opportunity which the situation may afford him for such misconduct, the gravity of the harm which may result, and the possibility that some other person will assume the responsibility for preventing the conduct or the harm, together with the burden of the precautions which the actor would be required to take.

Where the risk is relatively slight in comparison with the utility of the actor's conduct, he may be under no obligation to protect the other against it.

{¶ 134} Certainly, public policy favors preserving human life and preventing crime. *State v. Thomas*, 77 Ohio St.3d 323, 328, 673 N.E.2d 1339 (1997) (acknowledging public policy of preserving human life); *Welch v. Cleveland*, 97 Ohio St. 311, 316, 120 N.E. 206 (1917) (acknowledging public policy of preventing crime). And a number of Ohio statutes evidence the legislature's recognition of the importance of keeping guns out of the wrong hands. *See, e.g.,* R.C. 2923.13 (prohibiting carrying and use of firearm while a person is a fugitive from justice, indicted or convicted of offense of violence, drug dependent or chronic alcoholic, or mentally ill or incompetent); R.C. 2923.15 (prohibiting persons from carrying or using firearms while under the influence of alcohol or any drug of abuse); R.C.2923.20 (prohibiting furnishing weapon to person to whom R.C. 2929.13 or 2929.15 applies); R.C. 2923.21 (prohibiting the transfer of guns to minors); R.C. 2923.132 (prohibiting use of firearms by "violent career criminal").

{¶ 135} The public policy should be balanced against the burden of the precautions that the gun owner would be required to take. *See* Restatement of the Law 3d, Torts: Liability for Physical and Emotional Harm, Section 3, Comment e (2010). ("In cases in which a gun owner is held liable for negligently storing a gun, thereby giving

access to people who might use the gun improperly, the burden is the greater inconvenience the owner incurs in storing the gun in a more secure way.").[17]

{¶ 136} In *Stoffer*, 786 N.E.2d at 270, the court concluded that "[b]ased upon the significant number of gun-related crimes and the ease of securing a firearm in the home, we find that public policy favors the safe storage of firearms." It elaborated on the relative ease involved in discharging the duty to safely store firearms:

> Safe firearm storage, depending on the particular circumstances, can be accomplished by numerous non-burdensome means. Simply locking the front door, thereby preventing the public's access, may be sufficient in some circumstances. Where the risk of theft is greater, more safety measures might be required—such as placing the gun in a safe, locking the trigger, storing the gun and ammunition separately, taking back house keys, or changing locks. Different factual situations call for different methods of safeguarding, but most are relatively non-burdensome to gun owners.[18]

---

[17] *See also* Restatement the Law 3d, Torts: Liability for Physical and Emotional Harm, Section 19, Comment d (2010) ("[F]indings of defendant negligence * * * largely depend on consideration of the primary negligence factors[, including] * * * the foreseeable likelihood of improper conduct on the part of the plaintiff or a third party[;] * * * the severity of the injury that can result if a harmful episode occurs[; and] * * * the burden of precautions available to the defendant that would protect against the prospect of improper conduct by the plaintiff or a third party * * *.").

[18] The National Rifle Association (NRA), which has more than five million members and advocates for pro-Second Amendment policy and legislation on behalf of gun owners, also acknowledges the importance—and relative ease—of safely storing guns. It cautions: "Store guns so they are not accessible to unauthorized persons. Many factors must be considered when deciding where and how to store guns. A person's particular

67.

*Id.* at 269-270.  Similarly, in *Estate of Strever v. Cline*, 924 P.2d 666, 670 (Mont.1996), in concluding that a gun owner owes a duty to safely store his or her weapon, the Montana Supreme Court reasoned that requiring safe storage of a gun "would not impose an undue burden upon the gun owner in light of the danger involved and the necessity of preventing thefts of firearms or accidental shootings."  *Id.*

**{¶ 137}** Like the *Stoffer* and *Cline* courts, I would find that public policy counsels in favor of imposing a duty upon gun owners to store their weapons in a manner that is safe under the circumstances.  The burden of doing so is relatively minor when compared to the gravity of harm that may result when a firearm falls into the wrong hands.

## II.  Remand for Consideration by Trier of Fact

**{¶ 138}** The majority misinterprets Ciotto's argument as advocating a duty that would "essentially create strict liability for gun owners."  In fact, Ciotto advocates for imposing liability only where a gun owner fails to exercise reasonable care under the circumstances.  And to be clear, I do not suggest that we impose "strict" or "per se" or "absolute" liability where a gun has been taken without the consent of its owner and used to cause injury to another.  Rather, unless "reasonable minds can come to but one conclusion" that is adverse to the non-moving party under Civ.R. 56(C), a jury should decide whether the gun owner has breached his or her duty to store his or her weapon in a

---

situation will be a major part of the consideration.  Dozens of gun storage devices, as well as locking devices that attach directly to the gun, are available."  *See* National Rifle Association, *Gun Safety Rules, available at* https://gunsafetyrules.nra.org/ (last visited June 12, 2019).

68.

manner that is reasonable under the circumstances. *See, e.g., Mansfield R., L. & P. Co. v. Kiner*, 2 Ohio App. 82, (5th Dist.1913) ("[W]hether or not reasonable care was exercised in a given case is a question of fact for the jury, dependent upon the surrounding circumstances.").

{¶ 139} For example, it is possible that a gun owner may satisfy this duty by "[s]imply locking the front door, thereby preventing the public's access." *Stoffer*, 786 N.E.2d at 269-270. Other factual circumstances may require the gun-owner to take additional measures―reasonable under the circumstances―to secure their weapons. In *Stoffer,* for instance, the defendants stored their handgun between the cushions of a chair in their bedroom—hidden, but accessible. The Indiana Supreme Court held that it was a question for the jury "whether this constituted reasonable and ordinary care *in this situation.*" (Emphasis added). *Id.* at 271. Similarly here, having concluded that Hinkle owed a legal duty to store her weapon in a manner that was reasonable under the circumstances, I would remand this case to the trial court so that a jury may determine whether it was reasonable for Hinkle to store her loaded handgun in her unlocked nightstand drawer despite knowing that her son was mentally unstable, abused alcohol, had misused the weapon multiple times, and harbored irrational anger toward neighbors.